**MONON CORPORATION, Plaintiff,**

v.

**WABASH NATIONAL CORPORATION, Defendant.**

**Civ. No. L90–44.**

United States District Court, N.D. Indiana, Hammond Division, at Lafayette.

Oct. 31, 1991.

See also 764 F.Supp. 1320.

David Rosenthal, Lafayette, Ind., Stephen R. Patton, David L. Witcoff, Mark K.

**578**

Suri, Kirkland & Ellis, Chicago, Ill., for plaintiff.

Robert L. Bauman, Lafayette, Ind., Philip L. Cohan, Francis B. Burch, Jr. and Glen K. Allen, Baltimore, Md., for defendant.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

### I.

Judge Cudahy, speaking for the Court of Appeals, very recently provided a clear and concise statement of the parol evidence rule.

> The parol evidence rule provides that evidence of prior or contemporaneous agreements or negotiations may not be introduced to contradict the terms of a partially or completely integrated writing. See Restatement (Second) of Contracts § 215. A writing is deemed fully integrated if the parties intend it to be the expression of their entire agreement. If they intend the writing to be the final expression of the terms it contains but not a complete expression of all the terms agreed upon—some terms remaining unwritten—the agreement is termed partially integrated. See E. Farnsworth, Contracts 452 (1982). If a writing is only partially integrated, evidence of prior or contemporaneous agreements is admissible to supplement its terms though not to contradict it. If an agreement is completely integrated, however, not even evidence of a "consistent additional term" may be introduced to elucidate the writing. See id.; Restatement (Second) of Contracts § 215.

> Whether a writing is fully integrated is generally a question of law to be resolved by a court. See Calder v. Camp Grove State Bank, 892 F.2d 629, 631–32 (7th Cir.1990); E. Farnsworth, Contracts 460. A judge and not a jury should ordinarily answer this threshold question because it often requires going beyond the four corners of the written document and scrutinizing the very extrinsic evi-

> dence whose admissibility is at issue. See E. Farnsworth, Contracts 456 n. 25 ("[I]f there seems to be some circularity in examining the very evidence whose admissibility is at stake in order to determine its admissibility, it may help to keep in mind that this examination is made as a matter of law in order to determine whether the evidence shall go to the trier of fact.")

*Merk v. Jewel Food Stores,* 945 F.2d 889, 892–893 (7th Cir.1991).[1] This analysis is compatible with that of the same court three years earlier. *See Patton v. Mid-Continent Systems, Inc.,* 841 F.2d 742, 745–746 (7th Cir.1988). An extensive quotation from Judge Posner's opinion helps put the Indiana version of the parol evidence rule in context:

> When a contract is reduced to a writing intended to be the complete expression of the parties' agreement, the parol evidence rule is triggered and, in the event of a lawsuit, sharply restricts the admissibility of evidence concerning negotiations leading up to the writing. See Farnsworth, Contracts § 7.2 (1982). Why this should be so is one of the common law's enduring puzzles. The traditional explanation for the rule, that it reflects a preference for written over oral evidence, (citations omitted) seems inconsistent with the fact that the rule makes evidence of prior negotiations inadmissible even if written. The traditional explanation also makes the rule redundant, since if a contract is clear "on its face"—that is, if any judge reading it without special knowledge concerning its background would extract the same meaning from it—"extrinsic" evidence, evidence outside the "four corners" of the written contract, is inadmissible to vary that meaning, independently of the parol evidence rule. (citations omitted). Granted, the "four corners," "extrinsic evidence," and parol evidence rules are often run together, as in *American Fletcher National Bank & Trust Co. v.*

**1.** This case is cited with the full understanding that it was born in the unique context of collective bargaining agreements, and it also reflects

in Judge Easterbrook's dissent the difficulty of applying judicially drawn conceptual lines in different and highly contested factual settings.

*Pavilion, Inc.*, 434 N.E.2d 896, 904 (Ind. App.1982), vacated on other grounds, 453 N.E.2d 156 (Ind.1983). The first two rules seem identical; and *Hauck v. Second National Bank of Richmond*, 153 Ind.App. 245, 260, 286 N.E.2d 852, 861 (1972), describes the parol evidence rule as a "logical extension" of the "four corners" rule. But that should make one wonder whether the parol evidence rule might not have a separate function, beyond protecting contracting parties in advance from the uncertainty inherent in allowing a jury to range freely over testimony and revise the parties' deal to the jury's own liking; the other rules take care of that problem.

A somewhat more satisfactory explanation of the rule is that it expresses the parties' desire, in Professor Farnsworth's words, to "simplify the administration of the resulting contract and to facilitate the resolution of possible disputes by excluding from the scope of their agreement those matters that were raised and dropped or even agreed upon and superseded during the negotiations." Farnsworth, *supra*, § 7.2, at p. 451. It might appear that this ground, too, is traversed by the other rules—that testimony about the negotiations would be just another form of "extrinsic" evidence, or, equivalently, of evidence outside the "four corners" of the written contract. But there is more to it than this, since even if neither party denies that they came to an agreement during the negotiations, their subsequent action in signing a written contract intended to be the complete expression of their deal will make the prior agreement unenforceable.

One can argue that the garble in the description of the parties ... opened up this case to oral testimony for interpretive purposes only, a use that the parol evidence rule does not bar, at least if the written contract is ambiguous, see *id.*, § 7.12. This conclusion may seem inconsistent with the "integration" (i.e., no-parol-evidence) clause in the franchise agreement, but the position in Indiana is that such "clauses, rather than operating to exclude evidence, are merely probative of the parties' intentions.... [T]he preliminary question of integration, either complete or partial, requires the court to hear all relevant evidence, parol or written." *Franklin v. White*, 493 N.E.2d at 166–67.

What is suggested as a Seventh Circuit gloss on the rule in *Franklin* has been done here. This court has indeed heard much evidence regarding integration, both complete and partial.

Although there is some verbal variation in the statement of the rule in the Indiana law dealing with the same subject, the analysis in *Merk, supra*, provides a useful starting place in this case.

At approximately the same time that the mutual release at issue here was signed, the Supreme Court of Indiana, in *Franklin v. White*, 493 N.E.2d 161, 166 (Ind.1986), opined that integration clauses are an "effective drafting technique," because "[t]he written word is preferred as evidence because it is not subject to the vicissitudes of human memory." That court also went on to hold as follows:

[W]here two sophisticated parties engage in extensive preliminary negotiations, an integration clause may, in fact, reflect their mutual intention to abandon preliminary negotiations in favor of a complete and final statement of the terms of their agreement....

Integration clauses, rather than operating to exclude evidence, are merely probative of the parties' intentions. The parol evidence rule is a rule of preference. The written word is preferred as evidence because it is not subject to the vicissitudes of human memory. However, whether a particular writing constitutes such preferred evidence must depend on the intentions of the parties. The true operation of the parol evidence rule is upon the effect of parol evidence once heard. If the court determines that a writing is integrated as to a specific term, then prior statements or negotiations of the parties which would tend to contradict that term as it appears in their final written expression are simply irrele-

vant. If the agreement is completely integrated, constituting a final and complete expression of all the parties' agreements, then evidence of prior or contemporaneous written or oral statements and negotiations cannot operate to either add to or contradict the written agreement. In any event, the preliminary question of integration, either complete or partial, requires the court to hear all relevant evidence, parol or written.

493 N.E.2d at 166–67.

Certainly, it is required that this court freshly revisit its Memorandum and Order entered on June 21, 1991. This court will, therefore, cover all of the relevant issues on the basis of the record both before, during and after the evidentiary hearing on September 12, 1991, in Lafayette, Indiana. Post-trial briefs have now been filed and examined.

The jurisdictional basis of this case is 28 U.S.C. §§ 1338(a) and 1400(b).

This court has also had the full benefit of a complete transcript of the evidence presented in the September 12, 1991 trial and hearing. With reference to the June 21, 1991 Memorandum and Order, it needs to be said that the same was not carved in judicial stone.

In a general way, the final conclusion that is reflected here is consistent and compatible with the tentative conclusions that were reached on June 21, 1991. Of course, the issue with reference to the similarity of products was to be heard by the court as a result of a stipulation, and such is now ripe as an additional item for decision in this case.

A good deal needs to be said about the testimony of Henry Price, who is a tough-minded, tenacious, highly-sophisticated and experienced trial advocate. His testimony deserves to be delineated very carefully. This Memorandum and Order is designed to meet the demands of Fed.R.Civ.P. 52, and the demands of such cases as *Andre v. Bendix Corp.*, 774 F.2d 786 (7th Cir.1985); *Jones v. Jones Bros. Const. Corp.*, 879 F.2d 295 (7th Cir.1989); and *Louis Viutton, S.A. v. K–Econo Merchandise,* 813 F.2d 133 (7th Cir.1987).

## II.

This court has attempted to carefully and faithfully distill the testimony of Henry Price, lead counsel for Monon during settlement negotiations for the 1985 litigation, by placing it in chronological sequence.

November 8, 1985—Monon filed application for preliminary injunction. (R. 69).

November 20, 1985—Letter from Robert Bauman to Henry Price asserting Wabash's defenses to Monon's trade secret misappropriation claims. (R. 23).

Late 1985—Wabash agreed to change its stiffener panel design, and Monon agreed not to seek injunctive relief. (R. 25).

Late 1985—Discussions between Mr. Price and Frank Burch in which they negotiated value of trade secret damage claims and tried to evaluate any future claim for infringement of the '017 patent. Price proposed $1,000.00 per trailer for current damages. He believed damages if the patent issued would be $2,500.00 per trailer. Wabash responded that a pending patent is worth nothing until it issues, and since no one knew how the pending patent would issue, its future value was also unknown. (R. 26–28).

January 2, 1986—Monon's withdrawal of its application for preliminary injunction. (R. 73).

March 6, 1986—Meeting between Price, Richardson, Baylin, Bauman, and possibly Gambs attempting to narrow the issues prior to a pre-trial conference before this court. (R. 30, 33). The parties settled the injunctive relief issues on Monon's '883 and '349 patents, (R. 35, 29), and on the stiffener panel trade secret claim. (R. 36). The issue of the trailer design as a whole remained in dispute. There was much discussion of the value of the '017 patent once it issued. However, the parties decided that they could not agree on this issue and that it was best left in the future. An infringement claim on the future '017 patent was not before the court, so the parties agreed that they could deal with the patent issues when and if it became an enforce-

able patent. (R. 37). Price is sure that the group consensus was to deal with this subject later. (R. 38, 39).

March 17, 1986—Meeting at Barnes & Thornburg's Indianapolis office between Price, Richardson, Gambs, and Burch. Price proposed $500.00 per trailer, for a total of $500,000.00, to settle Monon's damage claims. There was no discussion of future patent infringement claims. (R. 39–42).

April 29, 1986—Letter from Price to Burch. Price mentioned that if the '017 patent issued before the current litigation went to trial, Monon's infringement claim on that patent would have to be tried before this court. If the patent did not issue before trial, Monon would have to bring a separate lawsuit on it. (R. 44–45).

May 14, 1986—Telephone call from Burch to Price. Burch said, "I'm not interested in a partial settlement," meaning that he did not want to allow Monon to reserve some damage issues and try them after Wabash had settled other issues for $25,000.00. Burch offered $100,000.00 to settle damage claims for trade secret and patent infringement (service tunnel and J-rail) issues. Price counterproposed $250,000.00 to settle "all those existing trade secret issues." (R. 45–47).

Late May, 1986—Meeting at Wabash offices between Price, Gambs, Jerry Ehrlich, Hoover, Klimara, and possibly Rod Ehrlich. No agreement was reached. Jerry Ehrlich said he wanted "global settlement," meaning settlement of trade secret issues, wage claims that Wabash (former Monon) employees had against Monon, and the issue of compensation of Wabash employees for participation in Monon's Alumax litigation. There was no discussion of pending patent. (R. 48–51).

June 4, 1986—Meeting between Price, Gambs, Jerry Ehrlich, and Hoover. Parties agreed on monetary amount to settle wage claim issue and Alumax compensation issues and "settled the existing trade secret claims" for $100,000.00. (R.

53). There was no discussion of pending patent. (R. 54).

June 7, 1986—Price first saw and reviewed the June 6 draft of the Mutual Release. (R. 56, 58).

June 10, 1986—Price talked to John Gambs at Monon's offices. Price had questions about paragraph 2; although the release of claims to the date of the release was clear, he questioned the "future use" language. It was explained to him that the reference to future use meant that Monon could not seek an injunction in the future for any theft of trade secrets that had occurred before and that Wabash had already compensated Monon for. (R. 65). There was no discussion of the pending patent. (R. 66).

There were no changes made to Mutual Release language in paragraph 2. Wabash never suggested that Mutual Release would waive Monon's rights to claim infringement once '017 patent issued. (R. 66). The parties never agreed on a monetary amount for Wabash to acquire rights to manufacture a plate trailer under the '017 patent if and when it issued. (R. 74). Wabash did not believe that the patent would issue. (R. 73).

Alongside the testimony of Mr. Price, it is necessary to consider the testimony of Donald J. Ehrlich, the president of Wabash, regarding his memory of these negotiations. Such has been examined very carefully, as follows:

About April 29, 1986—Ehrlich instructed Burch to respond to Price's letter concerning settlement that Wabash was not interested in any partial settlement. Ehrlich told Burch to offer $100,000.00—half in cash, half in services on the Alumax litigation. Price then proposed $250,000.00. (R. 88–89).

Wabash rejected the $250,000.00 offer. (R. 90).

May 1986—First meeting with Price, Gambs and others in Ehrlich's office. Price suggested taking the plate trailer issue out of consideration in order to settle the other issues. Ehrlich replied

that he was not interested in anything but a complete and total settlement of all issues. (R. 90). Price proposed leaving the plate trailer issue until a patent issued and then trying an infringement case. Ehrlich wanted "global peace." (R. 91). Ehrlich told Price that he wanted to avoid any further litigation. (R. 92).

Late May, 1986—Second meeting with Price, Gambs, and Rod Ehrlich at Wabash. (R. 94). Price asserted that a six-figure amount was necessary for settlement. Ehrlich inferred that this demand was in order to settle all issues; there was no more discussion on the pending patent. (R. 92). At least, Ehrlich does not recall specifically talking about the pending patent issue. (R. 115). The base rail and service tunnel issues were specifically settled. (R. 125–125).

Ehrlich had instructed Wabash's counsel to make it clear that all issues, including the pending patent issue, were to be settled. (R. 120). Price had also suggested "carving out" several other issues for later resolution. (R. 121–122).

Ehrlich's understanding of the agreement was that Wabash could continue to do whatever it was doing with Monon's patents, except for the specific agreements the parties made on the base rail and service tunnel patents. (R. 127–128). The important criterion was what Wabash was doing at the time, regarding even future patents. (R. 129). "It was my understanding that this mutual release resolved everything that had happened in the past. It also gave us the right to do whatever we were doing at the time that we resolved it and to be free from any further harassment in the future." (R. 132).

While the so-called Mutual Release that was formally signed on July 2, 1986 deserves to be examined as a whole, the key and contested provisions of that written document are in paragraph 2:

> Monon ... hereby release[s] finally and completely, and agree[s] to hold harmless insofar as their former employment, ... Wabash National Corporation ... from all claims, demands or liability of any kind whatsoever incurred or arising out of any act, omission or occurrence from the beginning of time to the date of this release, whether known or unknown, including, but not limited to, the future use of knowledge by ... Wabash National Corporation ... of the trade of manufacturing and selling semi-trailers and related goods and also including any claims as to patent infringement concerning products as presently manufactured by Wabash National Corporation.

As Judge Cudahy stated in *Merk, supra,* the major premise of the parol evidence rule is to exclude prior or contemporaneous oral agreements or negotiations to contradict the terms of a partially or completely integrated writing. On its face, this writing seems to be fully integrated; reference the language that it is an entire and complete agreement:

> This mutual release contains all the terms of the final agreement and understanding of the parties in settlement of L85–0070 pending in the United States District Court, Northern District of Indiana; it supersedes all negotiations and there are no other, written or verbal, agreements pertaining thereto.

Even if this agreement were labeled as partially integrated, that would not open the door fully to parol evidence, according to Judge Cudahy. A partially integrated document permits the evidence of prior or contemporaneous agreements to *supplement* but not to *contradict* it.

Also of vital importance is that the decisional process of determining whether a writing is fully integrated is generally a question of law to be decided by the court. In that phase of the process, a judge making a determination of whether a writing is fully integrated *may* hear the very extrinsic evidence whose admissibility is at issue. This is almost like the concept of *renvoi* in the law of conflicts. It is precisely in that vein that this court decided, with an abundance of caution, to hear evidence to determine whether the writing was in fact completely integrated in order to make that determination as a matter of

law. The statement of Judge Cudahy in this precise area of the law seems to be compatible with pre-existing law in Indiana.

The record in this case is absolutely clear that the Mutual Release signed and executed was the product of very intense, complex, sometimes convoluted negotiations between very sophisticated parties including top corporate executives and very experienced attorneys. In no sense is this mutual release a contract of adhesion such as a life insurance contract—far from it.

It is also important to understand that in 1986, and now, there was intense economic rivalry between these two corporations exacerbated greatly by deep personal animosity, especially because some executives who were formerly with one company are now in positions of authority in the other. Mr. Price's position at the present time is a sometimes unhappy one. His own talents and reputation as a lawyer are very much in the picture. He also appears to be completely capable of remembering past events to suit present purposes. Such is a completely human trait. Very much of his testimony is involved in his now impressions of the process of negotiation that took place more than five years ago. One cannot escape the suggestion that this appears to be that of a first-rate trial lawyer attempting to cover his professional tracks five years later. It is hard to believe that sophisticated, corporate parties whose adversarial relationship was as intense as that which existed between these two corporations would enter into a settlement that deliberately and intentionally left loose ends for future disposition or expensive litigation. Such is simply not reasonable.

The former senior Senator from Illinois, Everett McKinley Dirksen, often used the phrase, "the omniscience of hindsight." With no personal disrespect meant to Mr. Price, a good chunk of his testimony is of that variety. The plain and blunt fact is that these talented and sophisticated corporate executives and lawyers could have easily "carved out" from the Mutual Release the validity of the plate trailer patent, the application for which was then pending, by simply inserting one or two sentences; those sentences are absent.

■ When one looks at the totality of the proffered evidence regarding the preliminary negotiations of the Mutual Release, it appears that Mr. Price may well have "caved in" rather than "carved out." The evidence fails to convince this court that it should write into this Mutual Release the so-called "carved out" exception as is now suggested in this case. The court most respectfully declines to do so.

### III.

■ By the agreement and stipulation of counsel, it was necessary to hold an evidentiary hearing with reference to the phrase in the mutual release "any claims as to patent infringement concerning products as presently manufactured by Wabash." At least for these purposes, it appears that this is a partially integrated agreement and evidence may be heard not to contradict it but to supplement its terms.

Regarding the issue of whether Wabash's current product is the same as the product it was manufacturing on the date of the Mutual Release, Mr. Ehrlich essentially testified that the plate trailer manufactured in 1986 is the same product that is still manufactured. This court accepts and credits the testimony of Mr. Ehrlich on this subject as fundamentally correct. Again, the court has closely examined Mr. Ehrlich's testimony on this issue.

Wabash National Corporation's initial product line consisted of fiberglass reinforced plastic trailers. The line eventually included aluminum trailers, both plate and sheet-and-post, and flat trailers. Wabash was building a plate trailer in 1986. (R. 198–199).

Differences between a Wabash plate trailer built before June 1986 and a current Wabash product, observable in a photograph of the earlier plate trailer, are seen in the logo and the lights on the top. (R. 202).

A plate trailer is designed to carry the load by creating a joint beam. The two outer fibers of the trailer must be held apart, which is accomplished by vertical

posts and a very thin metal skin in a sheet-and-post trailer. A plate trailer replaces the skin with a thicker sheet of metal, the plate, which contributes to the compressive loading in the sidewall. A plate trailer therefore needs fewer, and narrower, side posts than a sheet-and-post trailer. (R. 204–205).

Wabash was using four designs of plate trailer side posts prior to the date of the mutual release. (R. 209). The current side post design includes a second piece, a piece of .050 inch aluminum sheet, (R. 210), called a lap insert, which is the subject of another patent, Wabash's '027 patent. (R. 211). The '027 is an improvement on the '017 patent and was applied for and issued after the date of the mutual release. (R. 213).

The slight differences between the side-post designs used by Wabash now and then does not undermine this court's basic conclusion that the manufacturing process on July 2, 1986, by Wabash, was the same as it is now.

### IV.

On June 21, 1991, and now, this court has construed the Mutual Release to mean that Monon agreed not to enforce the '017 patent against Wabash "concerning products as presently manufactured by Wabash National Corporation." If those July, 1986 Wabash products are the same as the Wabash products that Monon now complains about, Monon's present claim of patent infringement is barred by the Mutual Release and must be dismissed. The reference to products in the Mutual Release clearly includes the plate trailer that Wabash manufactures. That plate trailer was one of Wabash's basic products in July, 1986 and today. Obviously, the manufacturing process, while fundamentally the same, is an evolutionary one and is entitled to be improved. That does not change the fact that the product was fundamentally the same.

The defendant and counterclaimant, Wabash National Corporation, is entitled to a finding and judgment on both of the issues presented in the proceedings on September 12, 1991. Judgment shall enter accordingly in accordance with this Memorandum and Order in favor of Wabash National Corporation and against Monon Corporation. Costs are assessed against the plaintiff, Monon Corporation. IT IS SO ORDERED.