URSCHEL FARMS, INC., Harding Farms, Plaintiffs,

v.

DEKALB SWINE BREEDERS, INC., Defendant.

No. 3:93cv0211 AS.

United States District Court, N.D. Indiana, South Bend Division.

Feb. 14, 1994.

Diana C. Bauer, Milford M. Miller, Miller Carson Boxberger and Murphy, Fort Wayne, IN, for plaintiffs.

Douglas F. Fuson, Sidley and Austin, Chicago, IL, James R. Byron, Thorne Grodnik Ransel Duncan Byron and Hostetler, Elkhart, IN, for defendant.

### MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

#### I. Procedural History

On March 2, 1993, the plaintiffs, Urschel Farms, Inc., and Harding Farms (hereinafter

referred to jointly as "Urschel Farms"), filed a complaint in Wabash Circuit Court against Dekalb Swine Breeders, Inc. ("Dekalb"), alleging fraudulent misrepresentations. On March 29, 1993, the defendant filed its notice of removal with this court, which has diversity jurisdiction pursuant to 28 U.S.C. § 1332. On November 29, 1993, the defendant filed its motion for summary judgment. On January 3, 1994, the plaintiffs filed their memorandum in opposition to the defendant's motion. The defendant filed its response to the plaintiffs' memorandum on January 21, 1994. Oral argument was heard in South Bend on February 11, 1994.

## II. Facts

Urschel Farms owns and operates a hog farm in Urbana, Wabash County, Indiana. Dekalb operates an incorporated swine breeding business in Illinois. Between July 9, 1990, and February 19, 1992, the plaintiffs bought twenty-one boars from Dekalb. Defendant's Memorandum in Support of Motion for Summary Judgment ("Defendant's Memorandum") at 4. The parties executed five contracts in total during these transactions, all of which were signed by William P. Urschel. The plaintiffs allege that during the period between 1990 and 1992, their representative repeatedly inquired about rhinitis problems in Dekalb breeding stock. Plaintiffs' Complaint ¶¶ 8–18. The plaintiffs claim that the defendant's representatives denied any problems with rhinitis in its herd. Urschel Farms claims to have detected an increase of rhinitis symptoms in its herd during this two-year period. *Id.* On April 9, 1992, a snout check for acute rhinitis on a boar purchased from the defendants tested positive with "extreme terbinate damage." *Id.* ¶ 20.

## III. Standard of Review

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Russo v.*

*Health, Welfare & Pension Fund, Local 705,* 984 F.2d 762 (7th Cir.1993).

A thorough discussion of Rule 56 by the Supreme Court of the United States can be found in a trilogy of cases decided in 1986. *See, Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)[1]; and *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *Celotex* addressed the initial burdens of the parties under Rule 56, and *Anderson* addressed the standards under which the record is to be analyzed within the structure of Rule 56.

The initial burden is on the moving party to demonstrate, "with or without supporting affidavits," the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56). A material question of fact is a question which will be outcome determinative of an issue in the case. The Supreme Court has instructed that the facts material in a specific case shall be determined by the substantive law controlling the given case or issue. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine [material] issue for trial.'" *Id.* The nonmoving party cannot rest on its pleadings, *Hughes v. Joliet Correctional Center,* 931 F.2d 425, 428 (7th Cir.1991), or upon conclusory allegations in affidavits. *Cusson–Cobb v. O'Lessker,* 953 F.2d 1079, 1081 (7th Cir.1992). "The days are gone, if they ever existed, when the nonmoving party could sit back and simply poke holes in the moving party's summary judgment motion." *Fitzpatrick v. Catholic Bishop of Chicago,* 916 F.2d 1254, 1256 (7th Cir.1990).

During its analysis, this court must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Brennan v. Daley,* 929 F.2d

1. For the judicial epilogue of *Celotex,* see *Catrett v. Johns–Manville Sales Corp.,* 826 F.2d 33

(D.C.Cir.1987), *cert. denied,* 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988).

346, 348 (7th Cir.1991). Furthermore, it is required to analyze summary judgment motions under the standard of proof relevant to the case or issue. *Anderson,* 477 U.S. at 252–255, 106 S.Ct. at 2512–2514.

The 1986 Supreme Court trilogy was recently re-examined in *Eastman Kodak v. Image Technical Services,* — U.S. ——, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), a case born in the context of antitrust law. The most that can be said for *Kodak* is that it did not tinker with *Celotex* and *Anderson,* and possibly involves an attempt to clarify *Matsushita.* This view is well supported by an in-depth academic analysis in Schwarzer, Hirsch, and Barrans, *The Analysis and Decision of Summary Judgment Motions,* 139 F.R.D. 441 (1992).

## IV. Analysis

In this case, the defendant claims that it is entitled to summary judgment as a matter of law. Dekalb argues that its agreements, which limit all warranties and remedies, disclose the presence of disease in its herd, and contain a valid integration clause, are the final expression of the parties' intentions. Thus, the defendant claims this court should find that the parol evidence rule bars admission of any oral representations made to the plaintiffs. The plaintiffs allege that the oral representations became part of the contract as guarantees that the breeding stock was disease free. Alternately, Urschel claims that the oral representations were fraudulent, and thus admissible as an exception to the parol evidence rule. In its analysis, this court must first determine whether these agreements were fully integrated and, if so, whether an exception to the parol evidence rule applies.

### A. Whether the parol evidence rule bars admission of oral statements.

In *Merk v. Jewel Food Stores,* 945 F.2d 889 (7th Cir.1991), Judge Cudahy aptly formulated the parol evidence rule:

The parol evidence rule provides that evidence of prior or contemporaneous agreements or negotiations may not be introduced to contradict the terms of a partially or completely integrated writing. *See* Restatement (Second) of Contracts § 215. A writing is deemed fully integrated if the parties intend it to be the expression of their entire agreement. , If they intend the writing to be the final expression of the terms it contains but not a complete expression of all the terms agreed upon— some terms remaining unwritten—the agreement is termed partially integrated. *See* E. Farnsworth, Contracts 452 (1982). If a writing is only partially integrated, evidence of prior or contemporaneous agreements is admissible to supplement its terms though not to contradict it. If an agreement is completely integrated, however, not even evidence of a "consistent additional term" may be introduced to elucidate the writing. *See id.;* Restatement (Second) of Contracts § 215.

945 F.2d at 892–893.

In this case, the transactions involved the sale of goods, pursuant to Ind.Code Ann. § 26–1–2–105; thus, this court's analysis is governed by the Uniform Commercial Code as codified in Indiana.[2] The statutory language is concise on its restriction of parol evidence:

**Final written expression; parol or extrinsic evidence**

Sec. 202. Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:

    (a) by course of dealing or usage of trade or by course of performance; and

---

**2.** The Dekalb agreement forms all contain a choice of law clause: "This Contract shall be governed by the laws of the State of Illinois." Dekalb Contract To Purchase Hybrid Boars at ¶ 3. The parties have both briefed their arguments applying Indiana case law and statutes. A cursory comparison with Illinois law revealed only minor differences; thus, this court has applied Indiana law.

(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

Ind.Code Ann. § 26–1–2.1–202 (Supp.1993).

■ As Judge Cudahy stated in *Jewel,* the determination regarding the validity of an integration clause·is a question of law:

Whether a writing is fully integrated is generally a question of law to be resolved by a court. *See Calder v. Camp Grove State Bank,* 892 F.2d 629, 631–32 (7th Cir. 1990); E. Farnsworth, Contracts 460. A judge and not a jury should ordinarily answer this threshold question because it often requires going beyond the four corners of the written document and scrutinizing the very extrinsic evidence whose admissibility is at issue. *See* E. Farnsworth, Contracts 456 n. 25 ("[I]f there seems to be some circularity in examining the very evidence whose admissibility is at stake in order to determine its admissibility, it may help to keep in mind that this examination is made as a matter of law in order to determine whether the evidence shall go to the trier of fact.")

945 F.2d 889 (1991). This determination is properly at issue on a motion for summary judgment:

In absence of ambiguity, it is not within the function of the courts to look outside the instrument to arrive at the intention of the parties. *Kincaid v. Lazar* (1980), Ind. App., 405 N.E.2d 615, 620. Words of particular meaning will control general terms where both cannot stand together. *Fineberg v. Clark* (1965), 137 Ind.App. 528, 209 N.E.2d 528, 534, *reh. denied,* 137 Ind.App. 528, 210 N.E.2d 260. In most cases, construction of a written contract is a question of law for the court, with summary judgment being particularly appropriate.

*McCae MGMT. v. Merchants Nat. Bank & Tr.,* 553 N.E.2d 884, 887 (Ind.App.1990). Urschel Farms has not alleged that the terms of the five agreements were open or that ambiguities existed that needed to be clarified. In fact, Bill Urschel admitted in his deposition that once he did read the terms, he understood the limitations and remedies as written. Urschel Deposition at 167–68. Instead, the plaintiffs seek to have representations which directly contradict the plain language of the agreements admitted.

■ This court has analyzed the terms and circumstances of these agreements in determining whether the writings constitute a "complete and exclusive statement of the terms of the agreement" pursuant to Ind. Code Ann. § 26–1–2.1–202. In its analysis, this court has considered the inherently heightened risk factors involved in the sale of livestock as opposed to other goods, as specifically addressed by the U.C.C.:

(1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this UCC Article on parol or extrinsic evidence (IC 26–1–2–202) negation or limitation is inoperative to the extent that such construction is unreasonable.

(2) Subject to subsection o(3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

(3) Notwithstanding subsection (2):

(a) unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is," "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; and

(b) when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects

which an examination ought in the circumstances to have revealed to him; and

(c) an implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade; and

**(d) with respect to the sale of cattle, hogs, or sheep, there is no implied warranty that the cattle, hogs, or sheep are free from disease, if the seller shows that all state and federal regulations concerning animal health have been complied with.**

(4) Remedies for breach of warranty can be limited in accordance with the provisions of the UCC Article on liquidation or limitation of damages and on contractual modification of remedy (IC 26–1–2–718 and IC 26–1–2–719).

Ind.Code Ann. § 26–1–2–316 (1980) (emphasis provided). Thus, pursuant to § 316(d), in transaction involving hogs, no implied warranties exist in the absence of any animal health regulation violations. In this case, Dekalb's agreement forms reflect the U.C.C. language; each contains the completed statement: "I am in receipt of the DEKALB vaccination letter, dated _____, setting forth DEKALB's vaccination policy." The plaintiffs have not asserted that Dekalb failed to comply with state and federal regulations nor have they claimed that implied warranties were breached by the seller.

Dekalb did not merely rely on the language of the U.C.C.; instead, it conspicuously placed its limitations on warranties and remedies on the front page of its agreement form:

**7. *LIMITATION ON WARRANTIES AND REMEDIES***

**A. *WARRANTIES AND DISCLAIMERS OF WARRANTIES.* DEKALB WARRANTS ONLY THAT THE SWINE ARE AS DESCRIBED IN THIS CONTRACT, AND DEKALB ALSO PROVIDES THE LIMITED WARRANTIES REGARDING FERTILITY AS SET FORTH MORE FULLY IN PARAGRAPH**

**4. DEKALB GIVES NO WARRANTIES OF MERCHANTABILITY, HEALTH OR FITNESS FOR A PARTICULAR PURPOSE.**

**B. *EXCLUSIVE REMEDIES.* BUYER'S REMEDY OF REPLACEMENT OF SWINE (OR AT DEKALB'S OPTION, REFUND OF THE PURCHASE PRICE) FOR FAILURE TO CONFORM TO THE WARRANTY OF CONTRACT DESCRIPTION, TO THE LIMITED WARRANTY OF FERTILITY AND FOR MANIFESTATIONS OF CERTAIN PATHOGENS OR DISEASES, AS MORE FULLY SET FORTH IN PARAGRAPHS 4 AND 5 ON THE BACK OF THIS PAGE, IS THE BUYER'S SOLE AND EXCLUSIVE REMEDY AS AGAINST DEKALB ARISING OUT OF THE PURCHASE OF SWINE HEREUNDER.**

Dekalb's Contract to Purchase Hybrid Boars at ¶ 7. Paragraph 5, which is on page two of this two-page document, details the terms of the limited warranty regarding diseased animals:

**5. *PATHOGENS AND DISEASE— STATEMENT AND LIMITED REPLACEMENT POLICY* PATHOGENS AND DISEASE STATEMENT.**

**Organisms which cause swine diseases (called pathogens) are present in virtually every swine herd, including DEKALB's swine herds. Pathogens or diseases which have occurred, or which may occur, in DEKALB's swine herds include:** Bacterial Pathogens, including *Bordetella bronchiseptica, Campylobacter spp, Clostridium spp, Corynbacterium spp, Erysipelas spp, E. coli., Haemophilus spp (Actinobacillus spp), Leptospirosis spp, Mycobacterium spp, Mycoplasma spp, Pasteurella spp, Pasteurella multocida* Type A and D (toxigenic and non-toxigenic), *Salmonella spp, Staphylococcus spp, Treponema spp;* **Viral Pathogens,** including calici virus, congenital tremor virus, corona virus (*e.g.,* transmissible gastroenteritis-TGE and hemagglutinating encephalomyelitis-HEV), Picorna virus (*e.g.,* enteroviruses and encephalomyocarditis-EMC), porcine parvo virus, pox virus, rota virus, swine influenza virus and vesicular stomatitis virus; **Ectoparasites,** including

lice or mange; **Internal Parasites,** including ascarids and coccidia; **and Other pathogens or diseases,** including atrophic rhinitis; pseudorabies; all types of pneumonia; Eperythrozoonosis; Hemorrhagic bowel syndrome; Proliferative enteropathies; gastric ulcers; rectal and vaginal prolapses.

**This list is not exhaustive. New or different pathogens or diseases may arise.** (See also DEKALB's vaccination letter, which identifies pathogens for which DEKALB administers vaccines.) The outbreak of diseases, however, is caused by many factors in addition to the presence of pathogens within a swine or a swine herd. Although DEKALB attempts to minimize the presence of pathogens and diseases in its herds and in the swine breeding stock it sells, **DEKALB CANNOT AND DOES NOT GUARANTEE THE ABSENCE OF ANY PATHOGENS OR DISEASE IN THE BREEDING STOCK SOLD BY DEKALB. PATHOGENS OR DISEASES MAY BE PRESENT AT TIME OF SALE OR MAY APPEAR LATER.**

In addition to these explicit disclosures, Dekalb's agreement forms also limit the buyer's remedies, providing in pertinent part in § 5:

**REPLACEMENT FOR SPECIFIED DISEASES**

DEKALB will replace an individual swine purchased under this Contract (or at DEKALB's option, refund the purchase price), upon the following conditions:

a. **Diagnosis.** A licensed veterinarian, within 10 days after date of delivery of the swine to BUYER, in a written, signed and dated report, makes a diagnosis of any of the following diseases ("Replaceable Diseases") in the individual swine:

5) **Atrophic Rhinitis.** The written diagnosis for atrophic rhinitis must also be confirmed by both a gross and histopathological examination conducted by a state accredited animal diagnostic laboratory. Turbinate atrophy in excess of 7 mm in any quadrant of a cross section of the swine nose cut between the first and second upper pre-molar is sufficient to constitute a positive diagnosis for that swine. Neither (i) a positive nasal swab test for *Bordetella bronchiseptica* or *Pasteurella multocide,* Type A or Type D, non-toxigenic or toxigenic, nor (ii) a positive serological test for any other organism thought to cause atrophic rhinitis, is, by itself, sufficient for a positive diagnosis of atrophic rhinitis.

6) **Except for the limited warranty and limited remedy set forth in paragraph 4 and the Replacement Policy set forth in paragraph 5, the BUYER accepts full responsibility for these other factors and for the health, fitness, performance and productivity of the swine sold hereunder or the Buyer's swine herd.**

**BUYER has full responsibility for swine mortality or lack of soundness unless caused by a Replaceable Disease.**

Dekalb's Contract to Purchase Hybrid Boars at §§ 4–6 (in pertinent part). The plaintiff does not allege that the agreements contain terms that are unclear, unambiguous or "buried." In his deposition, the plaintiffs' representative, William P. Urschel, was questioned regarding his ability to understand the terms of the agreements:

Q   Having read the contracts again, which are, and the contract form, which are Exhibits 1, 2, 4, 5 and 6; is there anything in them that you don't understand?

A   In these contracts?

MR. BYRON: Right.

A   As of today, I understand now what they say.

Q   Okay, and would you have been able to understand them when they were delivered to you initially?

A   If I would have read them, yes.

Deposition of William P. Urschel at 167–68. This representative has also stated that, had he read the contracts, he would not have bought the hogs from Dekalb. *Id.* at 112.

■   On page one of the forms, Dekalb drafted an integration clause which required the plaintiffs' signature:

*SOLE AND ENTIRE CONTRACT.* THIS CONTRACT SUPERSEDES ALL PRIOR WRITTEN OR ORAL AGREEMENTS RELATED TO THE SWINE SOLD HEREUNDER, AND THIS CONTRACT CANNOT BE AMENDED EXCEPT IN A WRITING WHICH REFERS TO THIS CONTRACT AND WHICH IS SIGNED BY BOTH PARTIES....

**All of the promises, warranties, guarantees and representation made by the DEKALB sales person or any other representative of DEKALB that are not included in this Contract are as follows: (If none, please write "none." A blank will be considered "none.")**

_____

_____

_____

Dekalb Contract to Purchase Hybrid Boars at ¶ 8. In requiring the added hand-signed "none," Dekalb made considerable, affirmative efforts to refute any argument that this clause is buried boilerplate. This court has analyzed the validity of integration clauses in *Monon Corp. v. Wabash Nat. Corp.*, 780 F.Supp. 577 (N.D.Ind.1991), citing the Supreme Court of Indiana in *Franklin v. White*, 493 N.E.2d 161 (Ind.1986), which held:

> Where the parties are not in a position of power to bargain equally, the integration clause may not accurately express their meeting of the minds as illustrated in *Weaver,* [v. American Oil Co., 257 Ind. 458, 276, 276 N.E.2d 144] *supra.* However, where two sophisticated parties engage in extensive preliminary negotiations, an integration clause may, in fact, reflect their mutual intention to abandon preliminary negotiations in favor of a complete and final statement of the terms of their agreement.

493 N.E.2d at 166. In the case of the parties in this case, both classify as "sophisticated" buyers and knowledgeable hog farmers and breeders. Urschel Deposition at 24, 109. On oral argument, counsel for plaintiff attempted to distinguish Urschel's buyers, claiming that while they may be experienced

hog farmers, this does not allow an immediate conclusion regarding their sophistication as buyers. Urschel cites consumer cases in support of this argument. *Latham & Associates, Inc. v. William Raveis Real Estate, Inc.,* 218 Conn. 297, 589 A.2d 337 (1991); *Carpetland U.S.A. v. Payne,* 536 N.E.2d 306 (Ind.App.1989). This court does not find the cited cases analogous, however, since both *Latham* and *Carpetland* involved business persons who bought goods that were not necessarily connected to their trade. Here, hog farmers were buying hogs, not computers or carpeting. Hogs are Urschel's trade; if anyone knew the risks of buying, breeding and selling hogs, these hog farmers would.

This court has also considered all of the circumstances surrounding these agreements and finds none that constitute an uneven bargaining power. In each of the five situations when the parties entered into an agreement, the defendant produced two-page documents, each of which limited the warranties in bolded, capitalized, and even red print. The plaintiff hand-signed on each agreement the word "none" as to what other representations had been made. The agreements clearly, boldly, and explicitly disclosed the presence of disease in the Dekalb hog herd. At the time the parties entered each agreement, the defendant left the form with the plaintiffs, many days prior to delivery of the hogs. Defendant's Memorandum at 6. This court disagrees with Urschel's claim that the alleged oral representations, which directly contradict the plain language of the agreements, became part of the contract as "verbal guarantees." Plaintiffs' Memorandum at 4.

The agreements at issue in this case represent models of drafting technique. The forms are two-page, bolded, underlined, multi-colored documents. The defendant required the plaintiffs' representative to confirm in writing that no other representations had been made. The parties are both experienced in the type of transactions at issue. This court finds that the five agreements were fully integrated and that the parol evidence rule bars admission of any oral representations.

**B. Whether the alleged oral misrepresentations are admissible as evidence of fraud.**

The plaintiffs claim alternately that the alleged oral representations fall under the fraud exception to the parol evidence rule. Further, Urschel claims that they were induced to rely on oral representations instead of reading the contracts themselves. The plaintiffs also claim they rightfully relied on these fraudulent misrepresentations. The defendant argues that the plaintiffs cannot meet all the elements of a cause of action for fraud.

Specifically, Urschel claims that "DeKalb cannot avoid liability for its fraudulent misrepresentations by simply arguing that the plaintiffs should have engaged in a more careful reading of the written contracts." Plaintiffs' Memorandum at 22. As an initial matter, this court rejects this characterization of the level of scrutiny the plaintiffs gave these agreements. Bill Urschel, who signed all five agreements and added handwritten terms on each, testified that he never read any of the agreements. Urschel Deposition at 94–95. As discussed *supra*, Urschel claims that had he read the agreements, he would not have purchased the boars. The Urschel representative asserts that he considered the contracts a "mere formality," and that he relied on oral representations instead. Urschel admits, however, that he added the handwritten word "none" at the conclusion of a clause in the agreements that required information regarding any other representations to be put down.

■ This court agrees with the defendant that, under Indiana law, a failure to read a contract does not relieve a party from the obligations and limitations of the document. The defendant has cited Judge Lozano:

Further, the language contained in this clause is clear on its face. One who signs a contract in the absence of fraud or misconduct by another contracting party, is conclusively presumed to know its contents and to assent its terms. *Fustok v. Conticommodity Services, Inc.,* 577 F.Supp. 852, 856 (S.D.N.Y.1984); *Northville Indus. Corp. v. Fort Neck Oil Terminals Corp.,* 64 N.Y.2d 930, 477 N.E.2d 1102, 488 N.Y.S.2d 648 (1985); *British West Indies Guaranty Trust Co. v. Banque Int'l A Luxembourg,* 172 A.D.2d 234, 567 N.Y.S.2d 731 (1991).

*Ziegler v. Whale Securities Co., L.P.,* 786 F.Supp. 739, 743 (N.D.Ind.1992). The plaintiffs have construed the language in *Ziegler* as meaning that if misrepresentations were made, they were under no duty to read the agreements. Urschel bases its reliance on a situation that the plaintiffs argue parallels that in *Capitol Dodge, Inc v. Haley,* 154 Ind.App. 1, 288 N.E.2d 766 (1972). Plaintiffs' Memorandum at 25–27. Urschel asserts that, like the purchaser in *Capitol Dodge,* they were "lulled into not reading the contracts based upon the oral guarantees and representations made by DeKalb's agents." *Id.* at 27.

Urschel's own testimony refutes any argument of "lulling." As already discussed *supra*, all five agreements were left with the purchaser days before delivery of the hogs. The defendant's form reflect that Urschel wrote the word "none," in addition to signing the forms, reflecting that no other representations were made. As discussed *supra*, all of the limitations and disclaimers are printed on a two-page form in bolded, underlined and red language. These facts point more to an effort on the defendant's part to highlight, rather than bury their terms or lull their buyer. Urschel, in his deposition, admitted that he never read the agreements; yet, in their brief, the plaintiffs characterize their actions differently: "To ˙forgive DeKalb's fraudulent misrepresentations by determining that Bill Urschel should have more closely read the written contracts would be an unconscionable result." Plaintiffs' Memorandum at 27.

■ DeKalb argues that the plaintiffs cannot meet all the elements for a cause of action in fraud, which are enumerated in the Indiana Pattern Jury Instructions:

In order to recover in an action for fraud, the plaintiff has the burden of proving the following propositions:

First: That the defendant made false statements, representing them to be statements of past or existing material fact;

Second: That the defendant made the statements, knowing them to be false, or that he made the statements recklessly, without knowledge of their truth or falsity

Third: That the statements made were made for the purpose of inducing plaintiff to act upon them;

Fourth: That the plaintiff did justifiable rely and act upon the statements made; and

Fifth: That as a proximate result plaintiff sustained damage.

Indiana Pattern Jury Instruction No. 31.63. For purposes of the defendant's motion for summary judgment, this court makes an analysis of the elements of fraud in this case on the assumption that:

Bob Beahler and Heidi Heath, DEKALB sale persons, made oral statements to Urschel, Inc., which Urschel, Inc., took to mean that DEKALB did not have rhinitis in its swine herds and that DEKALB guaranteed against rhinitis.

Defendant's Memorandum at 10. In addition, this court assumes that the disputed representations constitute statements of fact, not opinion, although a strong argument could be made that a salesman's claim that no "problems exist" with rhinitis could never amount to more than an opinion.

The defendant argues that, even under these assumptions, the plaintiffs cannot demonstrate that they reasonably relied on the representations. Dekalb argues that the plaintiffs' claim of reliance directly contradicts its own written promise that no oral representations were made, handwritten on five agreements. The plaintiffs now assert that the oral representations were material; they considered them oral guarantees that the breeding stock was disease free. In light of the importance these oral statements carried for the plaintiffs, it is rather difficult to accept Urschel's rationalization that the word "none" written on five separate occasions amounts to no more than a "mere formality." Even if this court adopts such a rationalization, the plaintiffs still have to demonstrate that they had a right to rely on the statements.

The defendant argues that the "right of reliance is intermixed with the Plaintiffs' duty to exercise common sense and ordinary care and prudence in guarding against fraud." Defendant's Memorandum at 16 (citation omitted). Dekalb cites *Plymale v. Upright,* 419 N.E.2d 756 (1981), in which Judge Neal wrote:

"As noted at the opening of the discussion, reliance upon a misrepresentation is a material element of a cause of action in fraud. In *Frenzel v. Miller,* (1871) 37 Ind. 1, 17, the Supreme Court stated:

To constitute a misrepresentation a ground of fraud [sic] for avoiding the contract, or to entitle the injured party to his action, it must be in regard to a material fact, operating as an inducement to the purchase or the making of the contract, *and upon which the purchaser or person making the contract had a clear right to rely; and the party complaining must have been actually deceived thereby;* and generally, such representation must not be mere matter of opinion, or in respect of facts equally open to the observation of both parties, and concerning which the party complaining, had he exercised ordinary prudence, could have attained correct knowledge. If a party blindly trusts, where he should not and closes his eyes, where ordinary diligence requires him to see, he is willingly deceived and the maxim applies *volenti non fit injuria.*" (Emphasis added.)

*Plymale,* 419 N.E.2d at 761. The defendant cites several Indiana cases in which summary judgment was granted on the issue of a lack of right to rely on misrepresentations, including *Pugh's IGA v. Super Food Services, Inc.,* 531 N.E.2d 1194 (Ind.App.1988), which also cites the *Frenzel* language. *See Barnd v. Borst,* 431 N.E.2d 161 (Ind.App.1982); *Murphy v. Mellon Accountants P.C.,* 538 N.E.2d 968 (Ind.App.1989).

The plaintiffs in this case have testified that they are experienced hog farmers, that disease is ubiquitous in livestock breeding, and that they had cases of rhinitis in past herds of their own. Urschel Deposition at 46–48, 68–69. Urschel also testified that they have attempted to battle hog disease in their own herd by changing their method of

hog farming "all-in/all-out," prior to any boar purchases from Dekalb. *Id.* at 177. Even to a layperson, it would seem a fantastic proposition for an experienced farmer to claim he relied on a *guarantee* that he was purchasing *disease-free* animals. Given the serious risk disease poses, and the prevalence of rhinitis, plaintiffs cannot persuasively argue that they acted responsibly and reasonably in relying on a salesperson's statements regarding the level of disease in a hog herd. This court agrees with the defendant that ordinary diligence required the plaintiffs' representative to read the contracts he was not only signing, but to which he added language indicating no other terms or assurances had been agreed upon. Defendant's Memorandum at 18. Urschel testified that they had heard rumors of rhinitis problems and that they detected symptoms in the hogs. The plaintiffs cannot now argue that it was reasonable to just ask a few questions, to blindly sign agreements without reading them, and to continue to buy hogs over a two-year period if they had serious doubts regarding the boars' health. As the defendant has stated, if this course of action were reasonable, sophisticated purchasers would be well advised to read nothing and claim reliance later. In his deposition, Urschel seems to deny any requirement that he read the instruments he signs:

Q Now, you have testified earlier, haven't you, that you had known for a long time that bordetella was one of the causes of atrophic rhinitis; is that right?

A Yes.

Q. Okay. And then it goes on down further to describe some of the other pathogens or diseases, and it has got it in bold letters; do you see that? "Other pathogens or diseases"? It is about—

A Yes, I see it.

Q Okay, and it says, "Including atrophic rhinitis;" correct?

A Yes.

Q Okay. So it says it right there on the contract that you signed; does it not?

A It does.

Q. What else was DeKalb supposed to do other than; I mean, could they have stated this more clearly so that you would have understood it?

A They could have told me they had it, verbally.

Q Okay. That is the only thing different they could have done?

A Well, I think that would have been enough.

Urschel Deposition at 109–10.

In this case, the defendant has demonstrated that its procedures in contracting and its drafting of agreements go beyond mere formalities. The plaintiffs have testified that the agreements could not have been more clearly drafted. Dekalb even required the purchaser's written word that it was not relying on other representations. The defendant cites to an opinion by then Judge Ruth Bader Ginsburg, which, while not controlling, aptly formulates this court's view of this case:

Plaintiffs cannot overcome the written instrument here, and, particularly, the integration clause, by invoking the fraud-in-the-inducement exception to the parol evidence rule. The exception for a party who "has been induced by a fraudulent misrepresentation to enter the contract," *Giotis v. Lampkin,* 145 A.2d 779, 781 (D.C.1958); *Standard Motor Co. v. Peltzer,* 147 Md. 509, 128 A. 451 (1925), must not be stretched or inflated in a way that "would severely undermine the policy of the parol evidence rule, which is grounded in the inherent reliability of a writing as opposed to the memories of contracting parties." *Call Carl* [, *Inc. v. BP Oil Corp.*], 554 F.2d [623] at 630; [ (4th Cir.1977) ] *accord Tonn v. Philco Corp.,* 241 A.2d [442] at 445. We need not belabor the point. We have here the case of "a party with the capacity and opportunity to read a written contract, who [has] execute[d] it, not under any emergency, and whose signature was not obtained by trick or artifice"; such a party, if the parol evidence rule is to retain vitality, "cannot later claim fraud in the inducement."

*One–O–One Enterprises, Inc. v. Caruso,* 848 F.2d 1283 (D.C.Cir.1988) (citations omitted). As a matter of law, this court finds that even if all other elements for a cause of action in

fraud were met, these plaintiffs had no right to rely on any misrepresentations made.

## V. Conclusion

This court finds that since the agreements in dispute were fully integrated, the parol evidence rule bars the admission of alleged oral representations. Further, this court finds that, in asserting that the representations constituted fraud in the inducement, the plaintiffs have failed to demonstrate their right to rely on these statements. The defendant's motion for summary judgment is **GRANTED. IT IS SO ORDERED.**