Tim SCHWEIZER, Plaintiff,

v.

DEKALB SWINE BREEDERS, INC., Defendant.

John A. KRAMER; Steve Kramer; and J–Six Farms, Inc., Plaintiffs,

v.

DEKALB SWINE BREEDERS, INC., Defendant.

Keith BOONE, Plaintiff,

v.

DEKALB SWINE BREEDERS, INC., Defendant.

Nos. 95–2140–JTM, 95–2141–JTM and 95–2142–JTM.

United States District Court, D. Kansas.

Jan. 31, 1997.

Matthew L. Bretz, of Gilliland & Hayes, P.A., Hutchinson, KS, for Plaintiffs.

Mikel L. Stout, Amy Lemley & Martha Aaron Ross, of Foulston & Siefkin, Wichita, KS, and Charles T. Patterson, of Eidsmoe, Heidman, Redmond, Fredregill, Patterson & Schatz, L.L.P., Sioux City, IA, for Defendant.

## MEMORANDUM AND ORDER

MARTEN, District Judge.

The plaintiffs here are Kansas hog producers and the purchasers of boars from defendant DEKALB Swine Breeders, Inc. DEKALB is a Delaware corporation doing business in Kansas; its business involves all aspects of swine breeding. Plaintiffs allege the boars, purchased for breeding, had porcine reproductive and respiratory virus (PRRV), which caused plaintiffs a loss of production in their operations through stillborn pigs and abortions. The claims, defenses, evidence, and motions in the cases are virtually identical, with a few exceptions which will be identified in the course of the present order. The present actions were filed in 1995, although the sales agreements have provisions restricting suits to one year after the date of delivery.

In each of the cases, DEKALB has an outstanding motion for summary judgment and a motion to strike certain opinions offered by plaintiffs' expert veterinary witness (or, in the alternative, for leave to obtain additional expert testimony of its own). The plaintiffs have outstanding motions to amend the complaints to add claims for punitive damages and for leave to file additional deposition evidence.

The court finds that summary judgment is appropriate in light of Kansas law and cases from other jurisdictions. Contract provisions

identical in substance to those present here have been upheld against claims they were unconscionable or unfair. The sales agreements here explicitly notify the buyers that DEKALB has detected viral infections, and provide that the buyers assume the risk of viral outbreaks. The text of the agreements is clear; the portions relied on here by DE-KALB are written in bold and large type. Many of the important provisions are written in bright red ink. It is hard to imagine what DEKALB could have done to more clearly disclaim warranties or to otherwise set forth the defenses currently relied upon.

The agreements provide that DEKALB will test the animals to be delivered at the expense of the buyer. None of the plaintiffs exercised this option. The agreements effectively disclaim additional warranties and provide a space in which the buyer is required to indicate what additional promises or guarantees have been made by DEKALB. In each case, the plaintiff (or president of the plaintiff in the case of J–Six Farms) wrote "none" in that space.

The court will also grant the motion to strike. Read in the context of all the pleadings and the relevant state of discovery and evidence, the latest opinion offered by plaintiffs' expert is clearly an attempt to create new opinions to respond to DEKALB's motion for summary judgment, rather than, as plaintiff contends, merely providing some supplemental opinions based upon lab results recently turned over by DEKALB.

The standards relating to motions for summary judgment are familiar. Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital,* 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to sum-

mary judgment beyond a reasonable doubt. *Ellis v. El. Paso Natural Gas Co.,* 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1323 (10th Cir.1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.'*" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

PRRV first appeared in the United States in the late 1980s. The disease causes reproductive problems, including mortality in young pigs, lower birth weights, mummification, embryonic death loss, and stillborn pigs. Young pigs showing clinical PRRV signs experience respiratory problems. Many herds have become infected with PRRV without any introduction of animals from another herd. No vaccine was available until the summer of 1994, and the effectiveness of this vaccine is limited. PRRV poses no threat to human health.[1]

---

1. For an additional discussion of the history of PRRV, *see Pig Improvement Co. v. Middle States Holding Co.,* 943 F.Supp. 392, 398 (D.Del.1996).

According to DEKALB's expert, Dr. Roy Poage, the presence of antibodies indicates prior exposure to a pathogen, but does not itself indicate the pathogen is present in the animal. DEKALB uses prevention and treatment programs to control the spread of diseases. However, there is no way DEKALB can test its herds for all antibodies or pathogens. Instead, DEKALB focuses its efforts on detection of antibodies and pathogens relating to diseases on which the United States Department of Agriculture imposes quarantine, such as pseudorabies and brucellosis. DEKALB's testing practices are higher than industry standards.

No test to detect the presence of the PRRV virus or for antibodies to the virus was developed until March of 1992, when an antibody test was developed. The test does not determine whether a particular animal will develop PRRV in the future. A positive test for PRRV antibodies does not mean the animal is actually shedding the PRRV virus at the time the blood sample was taken. Animals may test positive for PRRV antibodies without any clinical signs of PRRV and never spread the virus to other animals. In addition, an animal that has been recently exposed to the virus may not have developed antibodies and thus test negative. Some animals never develop antibodies, even though they have the virus and are capable of shedding the virus to other pigs.

In response, the plaintiffs cite the affidavit supplied by their own expert, Dr. Henry, that a positive PRRV antibody titer test reveals the pig has been exposed to the disease within the last 90 to 140 days. Because the virus is active for 45 days to two months, a positive test indicates the pig is likely to be carrying the virus. This is the subject of DEKALB's motion to strike, as going beyond the scope of opinions expressed in Dr. Henry's Rule 26(a)(2) report.

That motion is addressed at greater length below. To summarize here, for purposes of the motions for summary judgment, plaintiffs argue the additional opinions were the product of DEKALB's late delivery of materials relating to its 1992 testing results. DEKALB points out, however, that (1) the materials were available to and reviewed by counsel for plaintiffs in another action [*Woodley v. DEKALB Swine Breeders, Inc.*, No. 93-CI–06704 (Dist.Ct. Bexar Co. Tex.)]; and (2) Dr. Henry has admitted the "new" materials did not affect his opinion. (Henry Depo. at 175–77.) Moreover, Dr. Henry's opinion that the PRRV outbreaks were caused, to a reasonable degree of veterinary medical probability, by animals from DEKALB, directly contradicts Dr. Henry's other statements on the issue. Dr. Henry concluded his report by stating:

> Based on the direct (virus isolation) and indirect (serologic) evidence of PRRV infection in these DeKalb herds it is probable that infected, carrier animals *could* have been sent to customers. It is *quite possible* that these infected animals were the source of infection for customer herds.

(Defs.' Ex. N.; emphasis added.) Dr. Henry was equally uncertain in his deposition about whether animals from DEKALB caused the outbreak, stating, "We have no way to prove that scientifically." (Henry Depo. at 163.) On whether the plaintiffs' herds might have been positive for PRRV antibodies prior to the deliveries from DEKALB, Dr. Henry responded that "it would be a pure guess." (*Id.* at 82.)

DEKALB presents a number of uncontroverted facts based upon the affidavit of Dr. William Brown, a DEKALB staff veterinarian. In the responses, the plaintiffs contend that Dr. Brown has been in Bosnia, and they have not had the opportunity to depose him. The responses were filed more than two months ago, and the court has not found that the plaintiffs have subsequently attempted to amend their responses. Plaintiffs do not offer any evidence from any other source which would contradict the evidence offered by Brown.

According to Brown, each DEKALB farm keeps a daily observation log in which the veterinarians and staff note the physical condition of the swine. Clinical signs consistent with any disease are recorded in the logs. Pursuant to company policy, each animal is inspected for clinical signs consistent with

disease or physical abnormality immediately before delivery. Buyers have the opportunity to inspect swine when they arrive. If an animal appears to be sick or physically abnormal, it will be returned and a replacement provided as soon as possible.

After the PRRV antibody test became available, DEKALB tested its Illinois research herds in May of 1992. The results of the test were negative.

Numerous reports existed at the time PRRV appeared in herds, even though no outside breeding stock had been introduced to the herd. Thus, even though DEKALB had not introduced any animals into its Kansas herds other than animals from herds in Illinois, DEKALB began to test its Kansas herds in June, 1992. These tests showed 80 of 84 samples positive for PRRV antibodies. None of DEKALB's herds showed clinical signs of PRRV at the time, a result consistent with other breeders.

In August, 1992, DEKALB received the results of virus isolation tests on pooled samples from selected pigs on its Kansas farms. The virus isolation test—unlike the antibody test—determines whether the virus is actually present in the animal. All the virus isolation tests were negative. Again, no clinical signs of PRRV were noted in any animals.

The first clinical signs of PRRV among DEKALB's herds occurred in December of 1992, when a noticeable increase in abortions was noted on one of the company's farms in Oklahoma. Clinical signs consistent with PRRV began to appear at the Kansas Foundation Farms in March, 1993. Antibody tests conducted during 1992 and 1993 showed numerous positive results for exposure to PRRV.

Later the same month, DEKALB received positive results on virus isolation tests for both Oklahoma and Kansas. Shortly thereafter, DEKALB added PRRV as one of the viral pathogens which had occurred in DEKALB herds in the company's written form contract. The contract was distributed to the sales force in June, 1993. It is uncontroverted DEKALB did not tell customers of the results of its June, 1992 PRRV antibody testing.

However, the sales contract which was used here does specifically warn that new and previously unidentified swine pathogens may arise at any time in herds. It also states that DEKALB herds have tested positive for exposure to PRRV. The 1994 version of the agreement provides:

> **Organisms which cause swine diseases (called pathogens) are present in virtually every swine herd, including DE-KALB's swine herds. Pathogens or diseases which have occurred, or which may occur, in DEKALB's swine herds include: ... Viral Pathogens,** including ... porcine reproductive and respiratory virus (PRRV), ...
>
> . . . .
>
> **... DEKALB CANNOT AND DOES NOT GUARANTEE THE ABSENCE OF ANY PATHOGENS OR DISEASE IN THE BREEDING STOCK SOLD BY DEKALB. PATHOGENS OR DISEASES MAY BE PRESENT AT TIME OF SALE OR MAY APPEAR LATER.**

(Defs.' Ex. I at ¶ 6.) This provision is identical to one in a 1990 agreement entered into by plaintiff Schweizer and the 1992 agreements entered into by plaintiffs Boone and J–Six Farms, with the exception that the 1994 agreement specifically includes PRRV as one of the viral pathogens which may be present.

The agreement also provided:

> 7. **TESTING AND QUARANTINE–BUYER'S RESPONSIBILITY.** At BUYER's expense, BUYER may have DEKALB test the swine for pathogens or diseases prior to delivery. BUYER may cancel this Contract prior to delivery on the basis of such test results. In such case, DEKALB will refund the deposit, minus the cost of testing.
>
> **DEKALB suggests that BUYER quarantine all newly purchased stock after delivery and test for pathogens and diseases that are of concern to the BUYER.**
>
> **BUYER expressly accepts all responsibility for:**
>
> a. The presence of any pathogen or disease (other than the Replaceable

Diseases) including, but not limited to, those pathogens or diseases listed in the Pathogen and Disease Statement above.

b. The emergence or appearance of a Replacement Disease after the 10–day period or quarantine period, if applicable, set forth above has passed.

c. The presence of any pathogen or disease in any swine other than swine purchased under this Contract.

. . . .

9. **BUYER'S RESPONSIBILITY STATEMENT.** There are numerous factors affecting the health, fitness, performance, and productivity of swine, including management, handling, nutrition, environment, sanitation, facilities, stress and disease. Furthermore, these same factors can cause and materially affect infertility and diseases of swine and the resulting economic impact, if any.

(Defs.' Ex. I.)

The agreement also provides:

**LIMITATION ON WARRANTIES AND REMEDIES**

A. **WARRANTIES AND DISCLAIMERS OF WARRANTIES. DEKALB WARRANTS ONLY THAT THE SWINE ARE AS DESCRIBED IN THIS CONTRACT, AND DEKALB ALSO PROVIDES THE LIMITED WARRANTIES REGARDING FERTILITY AS SET FORTH MORE FULLY IN PARAGRAPH 5.** *DEKALB GIVES NO OTHER WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE SWINE OR THEIR PROGENY. DEKALB GIVES NO WARRANTIES OF MERCHANTABILITY, HEALTH OR FITNESS FOR A PARTICULAR PURPOSE.*

B. **EXCLUSIVE REMEDIES. BUYER'S REMEDY OF REPLACEMENT OF SWINE (OR AT DEKALB'S OPTION, REFUND OF THE PURCHASE PRICE) FOR FAILURE TO CONFORM TO THE WARRANTY OF CONTRACT DESCRIPTION, TO THE LIMITED WARRANTY OF FERTIL-**

**ITY AND FOR MANIFESTATIONS OF CERTAIN PATHOGENS OR DISEASES, AS MORE FULLY SET FORTH IN PARAGRAPHS 5 AND 6 ON THE BACK OF THIS PAGE, IS THE BUYER'S SOLE AND EXCLUSIVE REMEDY AS AGAINST DEKALB ARISING OUT OF THE PURCHASE OF SWINE HEREUNDER.**

C. **TIME TO BRING SUIT. THE BUYER AGREES THAT IN NO EVENT MAY ANY LAWSUIT ARISING OUT OF THE SWINE SOLD HEREUNDER OR OF THIS CONTRACT BE FILED AGAINST DEKALB MORE THAN ONE YEAR FROM DELIVERY OF THE SWINE.**

D. **LIMITATION ON DAMAGES.** *UNDER NO CIRCUMSTANCES SHALL DEKALB BE LIABLE TO BUYER FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES OR CLAIMS OF ANY KIND, WHETHER ARISING IN CONTRACT, TORT, NEGLIGENCE, STRICT PRODUCTS LIABILITY, STATUTORY OR REGULATORY VIOLATION OR UNDER ANY OTHER LEGAL THEORY.*

(Defs.' Ex. I. at ¶ 11.) The language italicized here is written in bright red in the original agreement.

Finally, the agreement contains a box with a provision for the buyer's certification of the extent of additional promises:

*BUYER'S UNDERSTANDING I have discussed the purchase of DEKALB Breeding stock with DEKALB, and have read this Contract, and, in particular, the "Fertility–Limited Warranties and Limited Remedies[,]" the "Pathogens and Disease–Statement and Limited Replacement Policy", "Testing and Quarantine–Buyer's Responsibility", and the "Buyer's Responsibility Statement" on the back of this page.*

*I am in receipt of the DEKALB vaccination letter, dated ___, setting forth DEKALB's vaccination policy.*

*All of the promises, warranties, guarantees and representations made by the DEKALB sales person or any other representative of DEKALB that are not included*

*in this Contract are as follows: (If none, please write "none." A blank will be considered "none.")*

(Defs.' Ex. I.) This box contains three lines on which the buyer may indicate the existence of additional representations, and a signature line for the buyer. The box and the language inside it are written in bright red ink.

Tim Schweizer (plaintiff in Case No. 95–2140) began commercial hog farming in 1989. He has always had approximately 80 to 100 sows in his operation. Beginning in 1990, Schweizer has bought breeding stock from DEKALB pursuant to written contracts. Schweizer has also bought breeding stock from other producers.

Schweizer read and understood the terms of the first DEKALB contract in 1990. Although he had the opportunity, he did not read the later contracts because no one pointed out to him that the language had changed, and because he "didn't feel it probably would have been changed."

Schweizer entered into a written "Contract to Purchase Hybrid Boars and Security Agreement" with DEKALB on February 8, 1994. Schweizer signed both the box containing the "Buyer's Understanding" and the Agreement itself. In the lines under the "Buyer's Understanding" Statement, Schweizer wrote "none." Schweizer did not ask DEKALB to test any animal before delivery.

Two boars were delivered to Schweizer on March 11, 1994 from DEKALB's Foundation Farm No. 5 near Plains, Kansas. The two boars were never tested by DEKALB for PRRV or for antibodies to the PRRV virus.

Schweizer examined the boars upon delivery. Although one appeared lethargic, Schweizer did not see anything indicating they were diseased. He did not isolate the boars as recommended in the sales contract.

Three weeks later, according to Schweizer, his animals suffered a "massive and severe outbreak of PRRV." Schweizer has testified that clinical signs consistent with PRRV, including a reduction in farrowing rates from increased abortions, began to appear in mid-March 1994. Schweizer's damages arise out of the decreased production rates in his livestock.

Schweizer advances no claim based on breach of contract or breach of any affirmative statements made by a DEKALB sales representative, but brings the action because of what they didn't tell him. According to Schweizer, DEKALB sales representative Paul Sterbenze told him that if DEKALB had a disease outbreak in its breeding stock, it would not sell any pigs and would tell Schweizer if any disease problems developed in its herds.

It is uncontroverted that Schweizer is a "consumer" within the meaning of the Kansas Consumer Protection Act.

J–Six Farms (plaintiff in Case No. 95–2141) is a corporation organized under the laws of the State of Kansas. John Kramer is president and a 50% shareholder; Steve Kramer is secretary and treasurer and a 50% shareholder. J–Six Farms is a commercial hog producer and has had approximately 1800 sows in its operations at all relevant times.

J–Six Farms bought breeding stock from DEKALB on seven occasions in 1992. The pigs delivered to J–Six Farms were sent from DEKALB's farms near Plains, Kansas. The pigs were sold pursuant to written contracts, the language of which has been described above.

On each of the contracts John Kramer wrote "none" in the "Buyer's Understanding" box, indicating there were no additional warranties, guarantees or representations made by DEKALB. John Kramer testified he read and understood the terms of the contracts. Kramer testified he understood that the corporation had to accept the terms in the written contract if it were to receive breeding stock from DEKALB. No representative of J–Six Farms ever asked DEKALB to test any of the animals delivered.

Three weeks later, according to the complaint of J–Six Farms, it suffered a "massive and severe outbreak of PRRV." Kramer testified that clinical signs consistent with PRRV, including a reduction in farrowing rates from increased abortions, began to appear in June, 1992. The plaintiffs' damages

arise out of the decreased production rates in his livestock.

Plaintiffs advance no claim based on breach of contract, but instead bring their action on alleged statements made by DE-KALB sales representatives. According to Kramer, DEKALB sales representatives Kevin Steward and Corby Barrett told him DEKALB would advise him of any disease or type of problem DEKALB's herds were experiencing. Kramer states Steward and Barrett told him its herds were PRRV negative and DEKALB would not sell or deliver any pigs if DEKALB had a disease outbreak in its breeding stock.

Keith Boone (plaintiff in Case No. 95–2142) was a commercial hog producer who had, at all relevant times, approximately 800 sows in his operation. In business since 1962, Boone considers himself a sophisticated producer who knows the hog business well.

In addition to stock purchased from other sources, Boone bought breeding stock from DEKALB between 1982 and 1993. The sales were made pursuant to written contracts containing language which has been described above.

On March 29, 1993, 17 boars were delivered to Boone from DEKALB's Plains, Kansas farms under a written contract executed on September 14, 1992. Boone had the opportunity to review the contract, although he did not read it line for line. Boone testified he did not find the contract confusing.

Boone did not ask DEKALB to test the boars prior to delivery. In the "Buyer's Understanding" box in the contract, Boone wrote "none," indicating no additional promises, warranties, guarantees, or representations had been made by DEKALB.

Three weeks after delivery, according to Boone's complaint, his operation suffered a "massive and severe outbreak of PRRS." According to Boone's testimony, he was convinced by October of 1993 that DEKALB was responsible for the outbreak.

According to Boone, unspecified DEKALB sales representatives told him DEKALB's herd health was fine and DEKALB would not sell or deliver any pigs if DEKALB had a disease outbreak in its breeding stock.

It is uncontroverted that Boone is a "consumer" as that term is used in the Kansas Consumer Protection Act.

## I. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A. *Kansas Consumer Protection Act Claims*

Two of the plaintiffs—Schweizer and Boone—raise claims for alleged deceptive or unconscionable acts in violation of the Kansas Consumer Protection Act (KCPA).

#### 1. Deceptive Act in Violation of K.S.A. 50–626.

█ There is insufficient evidence to support plaintiffs' first claim under the KCPA, that of a deceptive act in violation of K.S.A. 50–626. *See Musil v. Hendrich,* 6 Kan. App.2d 196, 200, 627 P.2d 367 (1981). Here, the sales contracts expressly provided that viral infections (such as PRRV) had occurred in DEKALB herds. The 1994 agreement with Schweizer specifically names PRRV as one of the viral infections which had been detected. Given these manifest disclosures, the court will grant summary judgment as to the K.S.A. 50–626 claim.

#### 2. Unconscionable Act in Violation of K.S.A. 50–627.

Schweizer and Boone contend DEKALB violated K.S.A. 50–627 in that they received no material benefit from the transaction; the transaction was excessively one-sided in DE-KALB's favor; and DEKALB improperly attempted to exclude, modify, or otherwise limit implied warranties.

Under K.S.A. 50–267(b), unconscionability is a question of law to be decided by the court. In making this determination, the court should consider circumstances of which the buyer knows or should know, including several enumerated factors:

(1) That the supplier took advantage of the inability of the consumer reasonably to protect the consumer's interests because of the consumer's physical infirmity, ignorance, illiteracy, inability to

understand the language of an agreement or similar factor;

(2) that, when the consumer transaction was entered into, the price grossly exceeded the price at which similar property or services were readily obtainable in similar transactions by similar consumers;

(3) that the consumer was unable to receive a material benefit from the subject of the transaction;

(4) that, when the consumer transaction was entered into, there was no reasonable probability of payment of the obligation in full by the consumer;

(5) that the transaction the supplier induced the consumer to enter into was excessively onesided in favor of the supplier;

(6) that the supplier made a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment; and

(7) that the supplier excluded, modified or otherwise attempted to limit either the implied warranties of merchantability and fitness for a particular purpose or any remedy provided by law for a breach of those warranties.

K.S.A. 50–267(b).

Schweizer and Boone here invoke paragraphs (b)(3), (b)(5), and (b)(7) as grounds for concluding DEKALB acted unconscionably.

■ Kansas law appears to support DEKALB's argument that paragraph (b)(3) is not implicated here. A similar claim was advanced in *Musil v. Hendrich*, 6 Kan. App.2d 196, 627 P.2d 367 (1981). In *Musil*, the plaintiff hog farmer brought a claim under the KCPA when many of his herd died of dysentery after the introduction of hogs bought from the defendant, another hog farmer. Some of the hogs that died were those in the plaintiff's original herd; some were in the newly bought hogs. The court rejected plaintiff's claim of unconscionable act in violation of the KCPA grounded upon no "material benefit" under K.S.A. 50–267(b)(3):

This claim is not substantiated in the record; there is no evidence that Musil did not receive *a material benefit from the feeder hogs that survived,* and, furthermore, there is no evidence that at the time of the sale Hendrich *knew that the hogs would die.* Such knowledge is required by K.S.A. 50–627.

6 Kan.App.2d at 200–01, 627 P.2d 367 (emphasis added).

Based on *Musil,* the court must reject Schweizer and Boone's claim under paragraph (b)(3). First, there is no evidence DEKALB had any actual knowledge the boars delivered had PRRV or even that they were positive for PRRV antibodies. Second, in the case of the boars delivered to both Schweizer and Boone, the boars which were delivered survived and successfully bred offspring. There is no evidence to support plaintiffs' argument the transaction was unconscionable for not receiving any material benefit.

■ With regard to the plaintiffs' claim the transaction was excessively one-sided and thus unconscionable under paragraph (b)(5), the statutory commentary provides: "Subsection (b)(5) includes such conduct as requiring a consumer to sign a one-sided adhesion contract which is loaded too heavily in favor of the supplier, even though some or all of the contract terms are lawful in and of themselves." To demonstrate unconscionability, the consumer must show more than mere disparity in size; he must demonstrate that the circumstances of the transaction show the defendant enjoyed an unfair advantage. *See Wille v. Southwestern Bell Tel. Co.,* 219 Kan. 755, 759, 549 P.2d 903 (1976); *Atkinson v. Orkin Exterminating,* 5 Kan. App.2d 739, 743, 625 P.2d 505, *aff'd and op. adopted,* 230 Kan. 277, 634 P.2d 1071 (1981).

Here, there is little evidence which supports such a conclusion. Boone and Schweizer were both experienced hog producers, who could and did buy hogs from other suppliers. Both had the opportunity to read the sales agreements. Neither has identified anything in the agreements which is confusing, misleading or deceptive.

■ Finally, Schweizer and Boone contend DEKALB violated the KCPA by unconscionably attempting to restrict or disclaim warranties in violation of subsection (b)(7). Although the sales contracts here in issue do restrict and disclaim such warranties, an attempt to restrict potential warranties is not itself an unconscionable act per se. *Wood v. Harrison,* 771 P.2d 562, 1989 Kan.App. LEXIS 153, at *11–12 (March 10, 1989), *rev. denied,* April 25, 1989. Rather, the attempted disclaimer is one element the court must examine in combination with other facts present in the case in determining whether the seller has acted unconscionably.

K.S.A. 50–627 must be read in conjunction with K.S.A. 50–639(h), which, as an exception to the general rule prohibiting such disclaimers, provides:

> This section shall not apply to sales of livestock for agricultural purposes, other than sales of livestock for immediate slaughter, except in cases where the supplier knowingly sells livestock which is diseased.

*See also* K.S.A. 84–2–316(3)(d) (providing a similar basis for waiver under UCC).[2]

In many ways, the construction of this provision (and 84–2–316(3)(d), the comparable provision in the Kansas UCC) is the key legal question presented here. The exclusion of livestock not known to be diseased from the general prohibition of attempts to disclaim warranties means the plaintiffs' claims under the KCPA must fail. In addition, their general breach of warranties claims will also fail, since the warranties have been legitimately waived.

There is little in the way of law which has directly addressed the issue. In *State v. Ehlenfeldt,* 94 Wis.2d 347, 288 N.W.2d 786, 790 (1980), the Wisconsin Supreme Court upheld Wis.Stat. § 95.28(1), which prohibited the sale for slaughter of diseased animals, against a challenge the statute was unconstitutionally vague. The court concluded the statute was sufficiently clear to permit the ordinary person to understand its meaning:

The word "disease" is not so difficult or incomprehensible that a person of ordinary intelligence would be unaware of its meaning. It is commonly thought of as meaning sickness. Webster's New World Dictionary (1974) defines "disease" as "any departure from health; illness in general." The definition contained in Webster's Third New International Dictionary (1964), while more detailed, is to the same effect. It defines "disease" as: "an impairment of the normal state of the living animal or plant body or of any of its components that interrupts or modifies the performance of the vital functions, being a response to environmental factors (as malnutrition, industrial hazards, or climate), to specific infective agents (as worms, bacteria, or viruses), to inherent defects of the organism (as various genetic anomalies), or to combinations of these factors: SICKNESS, ILLNESS."

There is a good basis for concluding K.S.A. 50–639 serves to permit the type of disclaimers used by DEKALB in the present action. That is, the statute appears to require actual knowledge of the diseased nature of the animal sold. The KCPA does not directly define the term "knowingly," but as noted earlier, 50–639(h) closely tracks the general provision in the Kansas UCC which provides that no warranties arise in the case of the sale of livestock not for immediate slaughter. K.S.A. 84–2–316(3)(d). The UCC provides: "A person 'knows' or has 'knowledge' of a fact when he has actual knowledge of it." K.S.A. 84–1–201(25)(c).

Here, there is no evidence indicating DEKALB knew or actually suspected the animals sold to the plaintiffs had PRRV. At most, plaintiffs have provided evidence that other hogs produced by DEKALB had tested positive for exposure to PRRV in the months or years prior to the sales in issue.

It is uncontroverted the boars delivered to Boone and Schweizer showed no clinical signs of PRRV. In the responses to the motions for summary judgment, instead of focusing upon the animals actually delivered, Schweizer, Boone, and J–Six Farms concen-

---

2. The amended form of K.S.A. 84–2–316 was adopted by the Kansas Legislature in response to issues addressed in *United States v. Whitman,* 665 F.2d 313 (1981).

trate on the testing during 1992 and 1993 which revealed the presence of PRRS antibodies among DEKALB animals.

Other tests, however, indicated negative results. Moreover, positive antibody tests do not support a conclusion that an animal has or will develop PRRV. And virus isolation tests focusing upon actual presence of the virus, as opposed to mere exposure, were negative. The rate of increase in abortions among DEKALB herds was extremely small and could have been due to other factors. The uncontroverted evidence before the court is that pathogens exist in virtually all living animals, including livestock. The plaintiffs' expert testified that "you cannot say categorically that positive serologic animals are diseased at that point." (Henry Depo. at 145.)

More importantly, the evidence cited by plaintiffs relates only to other animals; there is no evidence the animals actually delivered to plaintiffs had tested positive for exposure to PRRV prior to delivery, and they never exhibited any signs of PRRV.

This interpretation would appear to be consistent with the plain language of the statute chosen by the legislature. In this context, it may be noted what the statute does NOT provide. K.S.A. 50–639(h) permits disclaimer of warranties for livestock unless the seller *"knowingly* sells livestock which *is* diseased."* (Emphasis added.) The statute does not provide that livestock warranties may be disclaimed except where the seller "knowingly or with reason to know sells livestock which is or might be diseased."

And the distinction also finds support in other provisions of Kansas law. The Kansas Legislature has adopted extensive provisions for the control and destruction of diseased livestock. K.S.A. 47–611(b) thus authorizes the state livestock commissioner to issue rules upon the governor's declaration of a livestock quarantine:

> The commissioner shall establish such quarantine immediately and shall give and

enforce such directions, rules and regulations as to separating, isolating, handling and treating, feeding and caring for such *diseased animals, animals exposed to the disease* and *animals within the quarantine which have not been immediately exposed,* as the commissioner deems necessary to prevent those classes of animals from coming into contact with one another.

(Emphasis added.)

The important point here is the legislature's inclusion of animals "exposed to the disease." The inclusion of this term has meaning only if the legislature understood that the term "diseased animals" by itself would otherwise be restricted to animals which have both been exposed to and contracted the disease. Clearly, the legislature was conscious of the distinction between "diseased animals" and "animals exposed to the disease."[3] Yet, in adopting K.S.A. 50–639(h), the legislature broadly permits disclaimer of livestock warranties, except where the seller knows the livestock "is diseased." Had the legislature intended the exception to the disclaimer to include animals known to be exposed, it could have done so.

One federal court recently held that similar DEKALB warranty disclaimers are not unconscionable under Iowa law. *Nelson v. DeKalb Swine Breeders, Inc.,* 952 F.Supp. 622 (N.D.Iowa, 1996). The court concluded:

> Despite Plaintiffs' implication that Defendant was hiding the warranty limitations and the real meaning of the contract terms, the Court finds the contract's language is clear and understandable. A harsh result of Plaintiff's failure to read or fully understand the contract prior to signing it does not allow Plaintiffs to avoid the contract terms. Because Plaintiffs have not alleged that they were under pressure to sign the contract or that the contract was a result of unfair bargaining, the Court finds that the contract was not unconscionable.

---

**3.** Other provisions in the Kansas livestock quarantine statutes carry forward the distinction. Thus, under K.S.A. 47–614, the commissioner has authority to determine when it is necessary to destroy "animals affected with or which have

been exposed to any such disease." *See also* K.S.A. 47–624(a) providing civil penalties for allowing a diseased animal to mingle with other animals "not affected with or previously exposed to such disease."

Op. at 626. The court thus concluded the contract terms were effective to disclaim both express and implied warranties. *Id.* at 626–27.

Finally, it should be noted plaintiffs also cite two early Kansas cases in support of their argument that a seller of livestock may be liable where it has reason to know of a potential infection. *See Germann v. Page,* 135 Kan. 276, 10 P.2d 830 (1932); *Cheesman v. Felt,* 92 Kan. 688, 142 P. 285 (1914). Both cases, however, were decided long before the KCPA, and therefore are of little assistance in interpreting the K.S.A. 50–627 and 50–639.[4] In neither case did the seller provide the clear waiver of warranties provided here.

### 3. Unconscionable Act in Violation of K.S.A. 50–639.

Boone and Schweizer also advance a separate claim of unconscionability under K.S.A. 50–639 based upon the use of the warranty disclaimers; but, as discussed above, the use of the disclaimers was found to be proper under K.S.A. 50–639(h). In any event, the text of K.S.A. 50–639 would not appear to create a separate (and duplicative to K.S.A. 50–637) claim for damages for violation of the KCPA. Rather, by its own terms, the effect of any improper waiver of warranties under 50–639 is not to create an additional claim for civil penalties, but to render the disclaimer void.

### B. *Breach of Warranties*

The claims of breach of implied warranty of merchantability and fitness for a particular purpose will stand or fall on the grounds discussed earlier. First, under K.S.A. 84–2–316(3)(d), no warranty will arise in the first place, since the sales involved livestock not for immediate slaughter and which were not known to be diseased at the time of the sale. Second, the warranties were properly disclaimed under the sales agreements.

■ In their responses, plaintiffs make the general argument that even though waivers such as those present here are contemplated

by Kansas law as reflected in K.S.A. 50–639(h) and 8–2–316(d), the disclaimers of warranties should be struck down as illegal adhesion contracts. The facts do not appear to support this argument. *See Wille v. Southwestern Bell Tel.,* 219 Kan. 755, 758, 549 P.2d 903 (1976).

Considered as a general matter of economic size, DEKALB is larger than any of the plaintiffs. But this alone is insufficient to find a contract provision unenforceable; rarely will two parties to a contract be of identical net worths. Here, the uncontroverted facts establish the plaintiffs were experienced hog producers. The plaintiffs were given the opportunity to read all the DEKALB contracts, and have indicated they understood the provisions the contracts contained. The challenged portions of the contracts are not concealed or written in fine print—they are alternately written in bold and capital letters, in either black or red ink. Each plaintiff could have purchased breeding stock from another supplier. Plaintiffs Boone and Schweizer did so. There is no evidence any plaintiff was compelled by economic circumstances to deal with DEKALB.

■ In addition to the basic disclaimer of warranties, DEKALB also relies on a provision in the 1992 contract with J–Six Farms which provides that any lawsuit arising out of the animals delivered must be brought within one year of the date of delivery. Although a breach of contract involving the sale of goods may ordinarily be brought within four years of the accrual of the cause of action, under K.S.A. 84–2–725(1), "[b]y the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it." *See Vanier v. Ponsoldt,* 251 Kan. 88, 108, 833 P.2d 949 (1992).

This provision appears to be enforceable against J–Six Farms, at least as to its breach of warranties claims. In its response, J–Six Farms argues it was "lulled" by the false sense of security provided by DEKALB, but

---

**4.** Moreover, in both cases the level of evidence was far greater than that presented here. The disease (cholera) had physically manifested itself either in the specific animals which were sold, *Germann,* 135 Kan. at 277, 10 P.2d 830, or in the death of other animals in the seller's herd only

one week before the sale. *Cheesman,* 92 Kan. at 689, 142 P. 285. Here, the evidence indicates only that DEKALB knew some of its animals had tested positive for PRRV antibodies in the months and years before the sale.

John Kramer admits in his deposition that he was "convinced" DEKALB was responsible for the PRRV outbreak in February of 1993. Any false sense of security was thus clearly removed by that time, yet the present action was not brought until well over a year later, in 1995.

The plaintiffs argue the contractual limitation period is an unenforceable adhesion contract. However, as with plaintiffs' argument that the warranty disclaimer portion of the contract is unconscionable, the uncontroverted evidence provides no support for voiding the contract provision providing a separate limitations period.

### C. Tort Claims

■ DEKALB argues the plaintiffs' tort claims should be dismissed since their damages—reduced production and lost profits—are purely economic injuries which cannot be considered property damage or physical injury. *AgriStor Leasing v. Meuli*, 634 F.Supp. 1208, 1217–18 (D.Kan.1986). It has been held that economic damages alone are not recoverable in a tort action. *Whittenburg v. L.J. Holding Co.*, 830 F.Supp. 557, 563 (D.Kan.1993). Here, the uncontroverted evidence establishes that PRRV presents no risk of danger to humans. Instead, plaintiffs are restricted to an economic injury based upon a qualitative defect in the product, and thus do not sound in tort. *See Daitom, Inc. v. Pennwalt Corp.*, 741 F.2d 1569 (10th Cir. 1984).

### 1. Fraud and Negligent Misrepresentation.

■ The court will grant summary judgment as to the plaintiffs' claims of fraud and negligent misrepresentation, since under the uncontroverted facts none of the plaintiffs have demonstrated reasonable reliance on any representation of DEKALB. *See Nelson v. DeKalb Swine Breeders, Inc.*, 952 F.Supp. 622 (N.D.Iowa 1996); *Rayle Tech v. DEKALB Swine Breeders*, 897 F.Supp. 1472, 1476–77 (S.D.Ga.1995); *Urschel Farms v. Dekalb Swine Breeders*, 858 F.Supp. 831, 840 (N.D.Ind.1994).

In *Nelson*, the court granted summary judgment not only as to the plaintiff's warranty claims, but also on the claims grounded on misrepresentation. After noting contract language similar to that present here, the court concluded:

> Plaintiffs' argument fails because Defendant did disclose the presence of congenital tremors in its herd. Paragraph 6 explicitly warns Plaintiffs of the presence of "[p]athogens or diseases which have occurred, or which may occur, in DEKALB's swine herds includ[ing]: ... Viral Pathogens: ... congenital tremors virus...." Thus plaintiffs' fraudulent misrepresentation claim fails and Defendant is entitled to summary judgment as to that claim.

Op. at 628.

As in the present case, the plaintiff in *Rayle Tech, Inc. v. DEKALB Swine Breeders*, 897 F.Supp. 1472, 1476–77 (S.D.Ga.1995), argued that prior oral representations as to the health of the hogs provided a valid basis for a claim of fraud. The court rejected the argument, citing provisions in the contract similar to those present here:

> Any reliance by Callaway upon Day's statements was unjustified in light of the clearly written contracts. All of the written contracts provide, in bold, capitalized print, that "DEKALB cannot and does not guarantee the absence of any pathogens or disease in the breeding stock sold by DEKALB. Pathogens or diseases may be present at time of sale or may appear later." Moreover, Callaway expressly accepted responsibility for "[t]he presence of any pathogen or disease including, but not limited to, those pathogens or diseases listed in the Pathogen and Disease Statement above."
>
> Callaway knew that the written contracts fully and completely reflected the agreement between the parties. All of the contracts contained a merger clause....
>
> ....
>
> In light of the unambiguous terms of the contracts, any reliance upon Day's statement by Callaway was unjustified.

897 F.Supp. at 1476–77 (record citations omitted). The court also rejected plaintiff's general claim of bad faith under Georgia law:

The clear language of the contract bristles with provisions dealing with the parties' rights in the event of disease. Paragraph 10 of the contracts, which occupies almost one quarter of the linear length of those documents, deals exclusively with pathogens and disease. It is unthinkable, given these provisions, that the parties' intent did not encompass the risk of disease. On the contrary, it is clear that Callaway and DEKALB recognized the risk of disease and allocated that risk between themselves. Callaway is a sophisticated party, and, under the facts of this case, the Court will not endeavor to rearrange the commercial relationship between Callaway and DEKALB which is so clearly set out in the contracts. A seemingly harsh result cannot be the excuse of dismantling the law. The parties are governed by their contracts.

*Id.*, at 1477–78.

The *Rayle Tech* court relied in part on the decision of Judge Sharp in *Urschel Farms v. DeKalb Swine Breeders,* 858 F.Supp. 831, 840 (N.D.Ind.1994). The court analyzed similar contract provisions and found they were not unconscionable adhesion contracts, since both parties to the contract "classify as 'sophisticated' buyers and knowledgeable hog farmers and breeders." 858 F.Supp. at 837. The court found:

> The agreements at issue in this case represent models of drafting technique. The forms are two-page, bold, underlined, multi-colored documents. The defendant required the plaintiffs' representative to confirm in writing that no other representations had been made. The parties are both experienced in the type of transactions at issue. This court finds that the five agreements were fully integrated and that the parol evidence rule bars admission of any oral representations.

*Id.*

The *Urschel* court also dismissed plaintiff's fraud claim, concluding that plaintiff had no right to reasonably rely on prior oral representations. *Id.* at 840 (quoting with approval then Judge Ruth Bader Ginsburg's opinion discussing the parol evidence rule in *One-O-One Enterprises, Inc. v. Caruso,* 848 F.2d 1283 (D.C.Cir.1988)).

The United States District Court for the District of Delaware reached a similar conclusion in *Pig Improvement Co. v. Middle States Holding Co.,* 943 F.Supp. 392 (D.Del. 1996). Although the case did not involve DEKALB, the contract disclaimers were similarly explicit. The court first upheld that contract's express limitation on consequential damages:

> Significantly, in 1992, PRRV was detectable and Delmarva [the buyer] could have administered serology tests of the PIC livestock at the time of delivery (which would have been required in any event to determine the status of the livestock delivered). PIC [the seller] did not have exclusive control over information about PRRV and certainly did not have the means to prevent the disease. The PIC/Delmarva contract *clearly contemplated the risk of communicable disease and allocated that risk within the parties' commercial relationship.* Under these circumstances, the court concludes that the limitation of remedies clause is not substantively unconscionable and, therefore, is enforceable.

943 F.Supp. at 403. The court then concluded the conspicuous disclaimer of warranties contained in the contract was sufficient to exclude any implied warranties. *Id.* at 405.

Here, DEKALB expressly stated it could not and did not guarantee the pigs were free from pathogens, and specifically stated PRRV had been detected among its herds. Moreover, pursuant to the terms of the sales contract, the plaintiffs accepted responsibility for the presence of any pathogens in the pigs. In the sales contracts, the plaintiffs expressly stated no additional representations had been made.

Summary judgment will also be granted as to the general negligence claim of plaintiffs. Plaintiffs have not identified any duty of care independent of the contractual agreement, and as stated earlier, the terms of that agreement preclude liability. *See Nature's Share, Inc. v. Kutter Products,* 752 F.Supp. 371, 385 (D.Kan.1990).

### D. *Causation*

 Finally, the defendants present a valid argument that the plaintiffs have failed to present proof of causation by demonstrating the outbreaks experienced by plaintiffs were actually caused by the boars supplied by DEKALB. As noted below, Dr. Henry's testimony at most indicates it is "quite possible" DEKALB was the source of the PRRS among the plaintiffs' animals.

In their responses, plaintiffs also cite to Dr. Shive, one of DEKALB's staff veterinarians. But Shive only testified it was possible one of the reasons for the outbreaks may have been incoming animals. There is no admissible expert evidence establishing that DEKALB animals were probably the source of the outbreak.

## II. DEFENDANT'S MOTION TO STRIKE

 DEKALB has moved to strike certain portions of an affidavit of Dr. Steven C. Henry, the plaintiffs' veterinary expert. This affidavit is dated October 31, 1996, and was prepared as part of the plaintiffs' responses to the motions for summary judgment filed by DEKALB. The affidavit is attached both to the responses to the summary judgment motion and to DEKALB's brief in support of its motion to strike. The challenged portions of the affidavit are:

3. Scientific and clinical observations show that PRRS is transmitted by direct contact between pigs that carry the virus, as well as some other possible, but less likely, vectors for the virus. The most likely and most common method of transmission of the PRRS virus is through the exchange of bodily fluids between pigs, such as the bodily fluids exchanged during breeding or through nose-to-nose contact. This is based upon published literature as well as personal experience as a clinician dealing with PRRS infections in swine herds.

. . . .

37. Within a reasonable degree of veterinary medical probability, it is my opinion that the DEKALB breeding stock were the source of the PRRS virus which was introduced into Plaintiff's herd causing the acute PRRS outbreak and loss in production.

38. It is important to note that a positive IFA antibody titer test demonstrates that the animal that was tested had been exposed to the PRRS virus within the preceding 9 to 140 days. Of the approximate 120 days within which an animal will test positive on the IFA antibody titer test, the animal will probably shed the virus for approximately 45 to 60 days. Thus, from a scientific standpoint, one may conclude that if an animal tests positive on the PRRS antibody titer test, it is likely to be carrying the PRRS virus and capable of transmitting the virus to other pigs.

39. The PRRS virus is capable of being transmitted by a pig within 24 hours after it has been exposed. A female pig may show clinical signs of PRRS within six to 14 days of exposure, or may not show any clinical signs at all. That is why, from a veterinary medical standpoint, it is important to consider any positive serology or virus isolation tests as revealing an infected, contagious, and diseased animal.

. . . .

41. A pig which tests positive on a PRRS antibody titer test must be considered an infected, contagious, and diseased animal because the positive antibody titer test reveals that the pig has recently been exposed to the PRRS virus and is likely to be carrying the virus for a period of 45 days to two months.

42. Based upon the PRRS test results form the DEKALB farms from which the animals were shipped to the Plaintiff, the DEKALB breeding stock were the only potential vector known to be PRRS positive at the time of delivery of swine to the Plaintiff herein.

43. Additionally, the proximity in time between the date of delivery of swine from DEKALB and the outbreak of PRRS in the Plaintiff's herd, provides further evidence that the PRRS outbreak in Plaintiff's herd came from animals delivered by DEKALB.

Specifically, DEKALB seeks to strike ¶¶ 3, 37–39, and 41–43 of the October 31 affidavit

because the affidavit contains opinions which go beyond Dr. Henry's prior reports (on May 19 and July 5, 1996), and therefore violates Fed.R.Civ.P. 26(e). If the motion to strike is denied, DEKALB seeks in the alternative leave to identify an additional expert witness to address the issues raised by Dr. Henry's October affidavit.

Plaintiffs contend the motion to strike should be denied because, first, the October affidavit reflects additional information contained in DEKALB lab reports of its 1992 testing and those reports were turned over to plaintiff only recently. Thus, plaintiffs contend the new opinions are legitimate supplementary opinions under Fed.R.Civ.P. 26(e). Secondly, plaintiffs contend the new opinions contained in Dr. Henry's affidavit merely reflect a clarification of opinions he expressed in his earlier reports.

The new opinions contained in Dr. Henry's affidavit cannot be considered as a supplemental report, since, pursuant to the court's revised scheduling order, any supplemental expert report should have been submitted by plaintiffs at the time of the parties' August 15, 1996 Rule 26(a)(3) disclosures, namely, August 15, 1996. Plaintiffs instead waited until October 31 to file the expanded affidavit. From the timing of events, it would appear Dr. Henry's much expanded opinion was prompted not so much by the additional 1992 lab reports as by DEKALB's summary judgment motions. In his deposition in December, Dr. Henry himself undercut plaintiffs' supplementation argument, stating his opinions were not altered by the materials which DEKALB turned over after July 5. In addition, while the 1992 results were turned over to these plaintiffs after July 5, the same information was made available to counsel for plaintiffs in a separate action, *Woodley v. DEKALB Swine Breeders, Inc.*, No. 93–CI–06704 (Dist.Ct. Bexar Co. Tex.)

Moreover, the actual opinions advanced in the October affidavit cannot be fairly said to be the natural product of receiving new materials after July 5. In his previous reports, Dr. Henry stated only that DEKALB was "a logical source" of the PRRS outbreaks and that it was "quite possible" the PRRS came from DEKALB.

The opinions expressed in the October 31 affidavit are fundamentally different. Not only does Dr. Henry conclude as a matter of scientific probability that DEKALB animals were the source of the outbreaks, he goes further and discounts any other possible cause for the contagion.

Although the additional material turned over after July 5 might give Dr. Henry additional justification for concluding that animals in DEKALB's herds tested positive for PRRS antibodies in 1992, it does not explain or justify the new conclusion that the cattle delivered in 1994 were diseased and were the most likely cause of the plaintiffs' injuries.

The contention that the October affidavit merely reflects a clarification or amplification of matters given in Dr. Henry's previous reports is not correct. Dr. Henry's July report is manifestly equivocal—he states only that "[i]t is quite possible that these infected animals were the source of infection for customer herds." The October affidavit represents a significant alteration, with Dr. Henry stating the DEKALB animals were probably the source of the outbreaks. Although additional materials subsequently submitted by DEKALB do include (among other things) some references to positive PRRS antibody testing in 1992, other evidence supplied by DEKALB prior to the July report also indicated positive test results in 1993.

Plaintiffs also cite to various testimonies of DEKALB experts, Dr. Shive and Roy Poage, but nothing therein supports the conclusions drawn by Dr. Henry in his October affidavit.

In summary, the additional opinions stated in the October 31 affidavit reflect general statements of causation, and are premised upon Dr. Henry's general understanding of PRRS and its characteristics; they are not grounded upon information only newly available to plaintiffs. There is no reason the opinions expressed in the affidavit could not have been stated earlier, at a time in compliance with the revised scheduling order and Fed.R.Civ.P. 26.

IT IS ACCORDINGLY ORDERED this 30th day of January, 1997, as follows:

Plaintiffs' motion for leave to file Dr. Henry's entire deposition testimony (Dkt. No. 101 filed 1/9/97) is granted.

Defendant's motions for summary judgment (Case No. 95–2140–JTM, Dkt. No. 68; Case No. 95–2141–JTM, Dkt. No. 67; Case No. 95–2142, Dkt. No. 69), and motions to strike (Case No. 95–2140–JTM, Dkt. No. 91 Part 1; Case No. 95–2141–JTM, Dkt. No. 91 Part 1; Case No. 95–2142, Dkt. No. 92 Part 1) are granted.

Plaintiffs' motions to amend (Case No. 95–2140–JTM, Dkt. No. 80; Case No. 95–2141–JTM, Dkt. No. 79; Case No. 95–2142, Dkt. No. 81) are denied as moot.